***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement dated July 30, 2002, as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between Lillian McColl and Moses H. Cone Memorial Hospital on or about February 9, 2001, and April 28, 2001.
3. Moses H. Cone Memorial Hospital was self insured during all relevant times, with Key Risk Management Services as its servicing agent.
4. Plaintiff was employed by Moses H. Cone Memorial Hospital as a registered nurse.
5. Plaintiff's average weekly wage during all times relevant to this claim was $949.26, yielding a maximum compensation rate for 2001 of $620.00.
6. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1: Plaintiff's medical records; and,
b. Stipulated Exhibit #2: Plaintiff's answers to interrogatories, including revisions and supplements.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was born on October 3, 1951, completed her Bachelor of Science degree in Nursing at East Tennessee State University in 1974 and began a nursing career in Louisiana. After moving to North Carolina, plaintiff began working for Wesley Long Memorial Hospital in 1984. During or about 1988, plaintiff began working at The Women's Hospital of Greensboro under operation by Moses Cone Memorial Hospital.
2. In her work as a registered nurse, plaintiff began routinely wearing latex gloves during the mid 1980s. Prior to the mid 1980s, plaintiff wore latex gloves for surgical procedures at least some of the time.
3. During the mid to late 1980s, plaintiff noticed that her hands were itchy, red, and frequently had little cuts. Certain liquid disinfectant soap caused plaintiff's hands to be irritated. As early as January 1986, plaintiff noted allergy to soap during her annual health screening. Plaintiff never saw a dermatologist for the condition, however, and simply treated with lotions. Moreover, she did not complete an Employee Incident Report regarding her alleged hand condition until more than ten years later in June 1999. Plaintiff switched to using latex-free and powder-free gloves during 1998 or 1999 and no longer suffered any symptoms with her hands. Plaintiff's hand symptoms were most consistent with irritant dermatitis and were not the result of latex allergy.
4. Plaintiff also claimed that she has experienced watery eyes. She could not recall when this symptom began but stated that it was not significant until the 1990s. Most often, plaintiff noticed her eyes watering while she was in her car on her way home from work.
5. Plaintiff also experienced nasal congestion and stuffiness. She admitted that she experienced these conditions prior to working at Wesley Long Hospital and that she experienced these symptoms away from the work environment. The pre-placement physical examination questionnaire completed when plaintiff applied for a job at Wesley Long in approximately 1983 or 1984 indicated that plaintiff had some occasional sinus trouble. During the 1980s, plaintiff also noticed congestion when exposed to certain odors or smells, particularly the scent of baby powder in colognes and soaps, including Phisoderm, a liquid soap.
5. As early as January 1986, plaintiff reported an allergy to soap on her employee health questionnaire. In June 1988, plaintiff also reported to defendant that she had an allergy to pollens. Nonetheless, plaintiff stated at the hearing that she had never had any symptoms or problems that she associated with exposure to pollens. Plaintiff did testify that during the 1990's she suspected she had an allergy to dust given her nasal congestion. Plaintiff could not recall when her symptoms occurred or what would have stimulated them.
6. During the 1990s and before 1998, plaintiff occasionally self-medicated at nighttime with Benadryl, an antihistamine, and Sudafed, a decongestant.
7. On October 1, 1998, plaintiff presented to Dr. Ronald B. Shealy of Salem Ear, Nose and Throat Associates with complaints of headaches and stuffy nose. Dr. Shealy noted that plaintiff reported a lifelong problem with allergies. His physical examination revealed enlarged turbinates and a right deviated septum. He ordered a Multiple Allergen ImmunoCAP blood test for various allergens, which was negative for each allergen tested. Dr. Shealy subsequently prescribed Nasarel, Allegra, and Sudafed.
8. During the fall of 1998, Dr. Shealy also ordered a latex-specific RAST blood test. Plaintiff tested negative for IgE mediated latex allergy. On April 24, 2000, at plaintiff's request, Dr. Shealy ordered a second latex-specific blood RAST test. This blood test was also negative for latex allergy.
9. In late November 2000, plaintiff sought refills on her prescriptions. Dr. Shealy's notes indicate that he refused to refill plaintiff's prescriptions without a follow-up office visit. There are no notes reflecting such a visit or any subsequent prescriptions from Dr. Shealy.
10. During January 2001, plaintiff made an appointment to see Dr. Kent J. Nastasi at Piedmont Allergy and Asthma Associates. After making the appointment, plaintiff claimed that she began experiencing shortness of breath and a cough. Plaintiff presented to Dr. Nastasi on February 9, 2001, with a chief complaint of "possible latex allergy." She related her prior history of hand rash and watering eyes. Although plaintiff testified that she began treating her nasal congestion with Benadryl and Sudafed during the 1990s prior to1998, she told Dr. Nastasi that she did not begin self-medicating until 1999.
11. Dr. Nastasi questioned plaintiff about allergens that can cause reactions in latex-allergic individuals. Dr. Nastasi noted that plaintiff felt "funny" after eating a banana on one occasion, and specifically noted that plaintiff denied the development of hives or itching. On the other hand, in an interrogatory answer, plaintiff stated bananas caused her skin irritation. At hearing, plaintiff insisted that she noticed during the 1990s that she would become itchy after eating bananas. Dr. Nastasi also noted that plaintiff thought that eating kiwis may have caused her to become "more stopped-up." At the hearing, plaintiff testified that she did know whether she had gotten "stopped up" or not.
12. In addition, plaintiff told Dr. Nastasi that she had felt lightheaded while in her car with a group of balloons two or three years before. She stated that she eventually felt better after putting the balloons in her trunk. Plaintiff was not very specific about how long it took her to get better, but felt that it occurred over a couple of hours.
13. Dr. Nastasi also recorded plaintiff's family and social history. He noted that plaintiff lives in a twenty-two-year-old home with carpeting in her living room, bedroom, and basement. Plaintiff's den is in the basement, and the carpet in the basement got wet due to leaks, which required sealing and the installation of a French drain. Dr. Nastasi testified that these conditions could cause toxic mold. Dr. Nastasi also noted that plaintiff has a six-year-old indoor cat.
14. Just off the den in plaintiff's home is a storage area in which plaintiff's husband, a salesman, has stored some of the industrial strength chemicals he has sold over the past ten years. The door to the storage area is usually open. Plaintiff's husband has used these chemicals to clean their home, including the bathrooms and kitchen.
15. Dr. Nastasi noted that plaintiff began smoking one pack of cigarettes per day at age 19 or 20. Plaintiff continued to smoke for approximately thirteen years, until she tried to become pregnant at age 32 or 33. Moreover, plaintiff's mother has smoked ever since plaintiff was a child. As an adult, plaintiff visited her mother when her mother was regularly smoking in her home. In addition, plaintiff's husband has been a smoker.
16. Plaintiff has a family history of allergies. Plaintiff's mother and sister have hay fever and significant allergies, including allergies to molds. Both of her children are atopic, and one had been taking allergy shots for approximately three years. Although plaintiff testified that her mother, sister, and children have allergies, she stated that she was unsure of their allergic symptoms.
17. Dr. Nastasi's physical examination of plaintiff on February 9, 2001, revealed a few bilateral wheezes on inspiration and expiration, some apparent coughing on forced expiration, and no crackles. Dr. Nastasi obtained lung functions and an inspiratory loop, which were relatively normal. Dr. Nastasi took plaintiff out of work pending further evaluation.
18. Dr. Nastasi ordered a latex-specific blood RAST test that was different from the two ordered by Dr. Shealy. Plaintiff again tested negative for latex allergy.
19. Dr. Nastasi placed plaintiff on a Prednisone taper. When plaintiff followed up with Dr. Nastasi on February 16, 2001, she reported that she felt better on the Prednisone taper but had continued to experience some coughing and wheezing on the taper and while away from work. Physical examination revealed a slight rightward septal deviation and minimal nasal congestion. Plaintiff's lung functions remained relatively normal. Dr. Nastasi recommended Flovent, Aerochamber, Singulair, Nasarel, Allegra, and Sudafed.
20. Upon Dr. Nastasi's recommendation, plaintiff also underwent a methocholine challenge at Salem Chest Specialists, P.A., which was positive for bronchospasm.
21. Plaintiff followed up with Dr. Nastasi on March 9, 2001. Again, her lung functions were good. Dr. Nastasi performed skin prick testing for routine aeroallergens, which was negative for each aeroallergen. Dr. Nastasi also did a skin prick test for latex, which was negative. Dr. Nastasi even did a skin prick test for banana, which can cause cross-reactions in latex-allergic individuals. This test was also negative.
22. Dr. Nastasi diagnosed vasomotor rhinitis. Although he later testified that he does not believe plaintiff has asthma, Dr. Nastasi's additional working diagnosis at the time was intrinsic asthma. Dr. Nastasi specifically noted that there was no evidence of IgE-mediated latex allergy. Dr. Nastasi treated plaintiff's condition with inhaled steroids, Singulair, Flovent, and Albuterol. Due to plaintiff's subjective report of symptoms around powdered latex gloves, Dr. Nastasi recommended that plaintiff try to work in an area where powderless gloves were used.
23. Vasomotor rhinitis is an idiopathic condition of unknown etiology that results from very sensitive nose tissue. Unlike allergic rhinitis, which is triggered by exposure to specific allergens (such as latex proteins) resulting in an IgE-mediated response, vasomotor rhinitis is triggered by exposure to non-specific irritants. Persons with vasomotor rhinitis have a personal predisposition or heightened sensitivity to stimuli in the environment, including innocuous type of stimuli such as colognes. Vasomotor rhinitis can be triggered by weather changes, temperature changes, strong odors, cigarette smoke, perfumes and colognes, emotional upset or stress, or changes in position. Symptoms can include congestion, runny nose, drip, drainage down the back of the throat, soreness, scratchiness, hoarseness, coughing, choking and sneezing.
24. Conjunctivitis is an inflammation of the conjunctiva, or lining, of the eye and can be triggered by the same irritants that trigger vasomotor rhinitis. It may also be caused by infection.
25. Asthma is a disease of the airways that results in constriction of the bronchial tubes and development of thick mucous. It is probably caused in its incipience by a genetic hypersensitivity of the airways, but it can be environmentally influenced by cigarette smoking and by viral infections. A person with asthma has airways that are very sensitive to non-specific irritants, such as odors and cigarette smoke. Intrinsic, non-allergic asthma is triggered by non-specific irritants rather than allergens (such as latex proteins). Irritant triggers include infections (particularly viral infections), exercise, emotional stress or upset, weather changes, irritants in the air such as dust, cigarette smoke, chemicals, fumes, odors, or pollution, and certain drugs or medications. Once triggered, intrinsic asthma can cause chest tightness, shortness of breath, difficulty breathing, coughing, wheezing, or rattling.
26. Plaintiff returned to work on Saturday, March 10, 2001, working her usual weekend option schedule. Plaintiff worked two twelve-hour day shifts on the weekend, and every other week she also worked one twelve-hour day shift during the week. She worked five out of six weekends in the antenatal unit and one out of six in the labor and delivery unit. Although not instructed to do so by Dr. Nastasi, plaintiff maintained a diary of her symptoms after she returned to work. She never shared her diary with Dr. Nastasi. Plaintiff testified that if she had experienced any symptoms, she probably would have recorded them in her diary.
27. During the two months following her return to work, plaintiff experienced symptoms away from the workplace on several occasions. In addition, there were many days when she worked and reported no symptoms while at work. For example, during her twelve-hour shift on Sunday, March 11, 2001, plaintiff felt fine and experienced no symptoms, even though she entered a room five minutes after an exam may have been performed using powdered latex gloves. The next day, on Monday, March 12, 2001, plaintiff felt okay while at home. That night, however, after being away from the workplace for more than twenty-four hours, plaintiff experienced some chest tightness and shortness of breath. Plaintiff self-treated with her Allegra and Nasarel. During the day on Tuesday, March 13, 2001, while still at home and away from the workplace, plaintiff continued to experience chest tightness, congestion, and fatigue. Moreover, plaintiff noted that there were stress factors involved and that stress could have been a factor in the onset of her symptoms while at home on March 12, 2001.
28. Plaintiff's diary entries do not indicate any further symptoms or problems until the first week of April, although she worked during that time. Plaintiff noted on Friday, April 6, 2001, that she had felt some wheezing all week, including four days when she was away from the workplace.
29. On Saturday, April 7, 2001, plaintiff worked. She noted that there were balloons in one room that did not seem to bother her. She also noted that one patient used baby powder at noon. Plaintiff claimed that she had an asthma attack at 2:00 p.m. and self-treated with her inhaler. She left work at 4:30 p.m. due to downsizing. On her way home, plaintiff claimed that her throat felt tight. At the hearing, plaintiff admitted that she never determined the specific trigger for her asthma attack. Plaintiff worked the next day, Sunday, April 8, 2001, but did not experience any symptoms while at work.
30. On Friday, April 13, 2001, plaintiff noted that she had felt chest tightness during the preceding week, including at least four days when she was away from the workplace. Plaintiff worked in labor and delivery for six hours on Saturday, April 14, 2001. She experienced no symptoms at work, even though powdered latex gloves were used at a delivery that day.
31. On Sunday, April 15, 2001, plaintiff worked in the Adult Intensive Care Unit and then in labor and delivery. She felt okay overall and did not experience any symptoms at work. She did note that she had become very dizzy by the time she came home. Plaintiff claims that during the night, away from the workplace, the dizziness continued, her eyes became red and watery, and she experienced sinus congestion. On Monday, April 16, 2001, plaintiff was not scheduled to work. Plaintiff recorded in her diary, however, that at home, away from the workplace, she experienced dizziness, sinus congestion, runny nose, shortness of breath, and the inability to take deep breaths.
32. Plaintiff worked on Tuesday, April 17, 2001, but did not experience any symptoms while at work. On Wednesday, April 18, 2001, plaintiff noted tender axillary lymph glands away from the workplace. She recorded that she was feeling a little better on Friday, April 20, 2001. Plaintiff worked on Saturday, April 21, 2001, and noted that the gland in the left side of her neck was very tender. She took two Allegra. Plaintiff worked again on Sunday, April 22, 2001. She noted that she took Allegra twice and ibuprofen. She claimed that her grasp felt weak, she was dropping things, and had difficulty starting IVs. She also noted some nasal drainage.
33. Plaintiff did not work on Monday, April 23, 2001. She noted, however, that she felt fatigued, slight dizziness, sinus pressure, sinus drainage, and a slight to moderate headache away from the workplace. On Friday, April 27, 2001, plaintiff recorded that in summary she had felt bad all week, had been very weak, and had had difficulty in focusing on preparing for her daughter's birthday party. Plaintiff had not worked since Sunday, April 22, 2001.
34. Plaintiff claims that on Saturday, April 28, 2001, as she stood in a hospital hallway speaking with a doctor, she experienced watery eyes and lost her voice. The doctor was not wearing any gloves at the time of their conversation. In her answer to interrogatories and in the Employee Incident Report, plaintiff stated that the doctor had worn powdered latex gloves for a delivery less than one hour previous. At hearing, however, plaintiff initially claimed that the doctor had attended a delivery within the past twenty minutes and then stated that she was not sure what timing the Employee Incident Report indicated. In any event, plaintiff testified that the symptoms reversed themselves within one to two minutes.
35. Plaintiff also claims that on Sunday, April 29, 2001, she wore a mask during a vaginal exam conducted by a doctor; the doctor removed his or her gloves. Plaintiff re-entered the examination room approximately twenty minutes later and claims that she developed a runny nose and stuffy head, became very hoarse, and experienced a broken voice, chest tightness, and slight dizziness. Plaintiff self-treated with her inhalers. The same day, plaintiff completed Employee Incident Reports for both Sunday's incident and Saturday's incident. Plaintiff did not return to work with the employer after Sunday, April 29, 2001.
36. When plaintiff called Dr. Nastasi's office on Monday, April 30, 2001, Dr. Nastasi's associate, Dr. Stone, prescribed a Medrol Dosepak.
37. On Monday, May 7, 2001, plaintiff recorded in her diary that she had used her inhalers at least four times a day since Sunday, April 29, 2001 and was still feeling wheezy and had some chest tightness. She also noted a slight headache and worsened drainage over the past two days. The plaintiff's symptoms continued and even increased while she was away from the workplace.
38. When plaintiff presented to Dr. Nastasi on May 8, 2001, however, he found that plaintiff's eyes were clear, her nasal mucosa was not swollen, her lungs were clear, and her pulmonary function was normal. Based solely on plaintiff's subjective report, Dr. Nastasi assessed a flare of rhinoconjunctivitis and chest symptoms after exposure to powdered latex gloves. He specifically noted that plaintiff did not have a documented IgE-mediated sensitivity to latex and speculated that this could simply be an irritant effect. Dr. Nastasi decided to follow-up with a latex skin patch test and also treated plaintiff with Advair, Singulair, and Albuterol.
39. On May 22, 2001 Dr. Nastasi conducted a contact dermatitis skin panel that included natural rubber. In addition, Dr. Nastasi placed a crude latex glove patch on the plaintiff. After forty-eight hours, both the natural rubber skin panel site and the crude latex glove patch tests were negative. Dr. Nastasi also conducted a "wet glove" test, whereby he placed a wet latex glove on plaintiff's finger for fifteen to thirty minutes. Plaintiff exhibited no symptoms.
40. Plaintiff took a leave of absence from her job with defendant after the alleged April 29, 2001 incident. She collected unemployment benefits at the rate of approximately $396.00 per week for approximately ten weeks.
41. On December 10, 2001 plaintiff began work with Accordant Health Services as a telephone health intervention and disease management nurse. Plaintiff's base salary with Accordant is $3,833.33 per month, although she testified that she is paid $2.50 per hour for all hours over thirty-six hours per week. Plaintiff testified that she regularly works more than thirty-six hours per week and is paid in excess of $3,833.33 per month.
42. Meanwhile, plaintiff did not respond to defendant's queries regarding her leave of absence. Defendant subsequently learned that plaintiff had secured other employment and accepted her actions as a voluntary termination of her employment effective February 28, 2002.
43. Plaintiff has continued to experience upper and lower respiratory symptoms, including nasal congestion, watering eyes, shortness of breath, and chest tightness, since she last worked with defendant on April 29, 2001. These symptoms have occurred while at home and in the absence of any alleged exposure to powdered latex gloves or other latex products.
44. On Tuesday, September 4, 2001, plaintiff was evaluated by Dr. Henke at the University of North Carolina Hospitals. He repeated a scratch skin test panel, which was negative. Plaintiff did react to intradermal testing for allergy to Mold Mix II and BJ Grass Mix. Although the pulmonary function studies obtained by Dr. Henke were essentially normal, he did confirm the diagnosis of asthma. Plaintiff claimed that she became hoarse when she entered Dr. Henke's pulmonary function testing area but that the hoarseness went away. Plaintiff claims that she later developed congestion on the way home. The next day, on September 5, 2001, plaintiff felt "air hungry" and had nasal congestion. At 11:00 p.m. that night, at home, plaintiff felt chest tightness and some palpitation, which subsided after about an hour. On Thursday, September 6, 2001, plaintiff continued to feel "air hungry."
45. When plaintiff followed-up with Dr. Nastasi on October 10, 2001, he decided to treat plaintiff's symptoms with Albuterol as needed but did not reinstitute steroid treatment. Although Dr. Nastasi did not observe any such symptoms during plaintiff's visit, plaintiff claimed that she experienced swollen eyes and nasal stuffiness on the evening of October 10, 2001. She self-treated with Benadryl over the following two days and used an inhaler on the third day.
46. On referral from Dr. Nastasi, plaintiff saw Mr. David Blalock, M.A./CCC, at the Center for Voice Disorders at the Wake Forest University Baptist Medical Center on October 15, 2001. Mr. Blalock concluded that there was no strong evidence of laryngeal hyperfunction. Plaintiff felt okay and experienced no symptoms while in the medical environment from 10:30 a.m. to noon. She claimed, however, that when she was at home later she coughed up white mucous.
47. On November 9, 2001, plaintiff attended a field trip to the Outer Banks with her daughter's class. The following day, at home, plaintiff experienced a headache, sinus pressure, and stuffiness. In her diary, plaintiff stated that she was unsure whether the symptoms may have resulted from the trip or from some fresh paving completed near her home.
48. At some time near the end of January 2002, plaintiff developed a painful, itchy rash on her lower leg. Plaintiff also claimed that in early February 2002, while her mother was using a powdered, latex theraband for physical therapy in plaintiff's home, plaintiff experienced a flat, pinhead size rash in fifty to sixty places on her back. Plaintiff claimed that she self-treated with Benadryl for two days and that her symptoms fully resolved. When plaintiff presented to Dr. Nastasi on February 20, 2002, he diagnosed eczema on plaintiff's right leg and right arm but made no mention of a rash on plaintiff's back.
49. At the hearing before the Deputy Commissioner on June 30, 2002, plaintiff had trouble with some coughing. When asked whether she knew what had triggered her coughing, plaintiff stated that she would consider the possibility that she was exposed to latex when she accompanied her mother to the emergency room the day before. She further testified that there is "rubber everywhere you look." Plaintiff then admitted that her coughing could be absolutely unrelated to that. In fact, she concluded that she did not know what had triggered her coughing during the hearing.
50. Dr. Kent J. Nastasi, board certified in pediatrics, internal medicine, allergy and immunology, treated plaintiff at Piedmont Allergy and Asthma Associates. Dr. Nastasi had been in practice for five years at the time of his deposition. Dr. John Klimas, a board certified allergist and clinical immunologist at Carolina Asthma Allergy Center and former President of the North Carolina Asthma, Allergy and Immunology Society, reviewed plaintiff's medical records, plaintiff's employee health file, plaintiff's Employee Incident Reports, plaintiff's personal diary entries during 2001, and plaintiff's answers and supplemental answers to interrogatories and request for production of documents. Dr. Klimas had been in practice for approximately 24 years at the time of his deposition. Dr. Nastasi and Dr. Klimas both testified, and the Full Commission finds as fact, that a diagnosis of latex allergy requires both a positive clinical history and a positive test for latex specific IgE antibodies. Inasmuch as plaintiff has tested negative for latex specific antibodies on seven different occasions, Dr. Nastasi and Dr. Klimas both opined, and the Full Commission finds as fact, that plaintiff is not allergic to latex.
51. The most credible and competent evidence indicates that plaintiff is not allergic to latex or latex glove powder. Instead, plaintiff's clinical symptoms and alleged incidents, both at work and outside of work, are most compatible with and were most likely caused by her vasomotor rhinitis, conjunctivitis, and mild intrinsic asthma. Plaintiff's vasomotor rhinitis and conjunctivitis are idiopathic conditions of unknown etiology. Plaintiff's mild intrinsic asthma is the result of her genetic predisposition to have hypersensitive airways, as well as her history of cigarette smoking, which caused direct injury to the lining of the bronchial tubes and therefore made her airways more sensitive.
52. Dr. Nastasi testified that based on plaintiff's subjective history, her exposure to glove powder may have had a temporary irritant effect on her hypersensitive nose and airways. He further testified that such an irritant effect was no different from the effect caused by the other possible triggers of plaintiff's symptoms in everyday environments away from the workplace, including odors and perfumes. On the other hand, Dr. Klimas opined that plaintiff's reported symptoms were not related to her employment with defendant and her exposure to powdered gloves. The Full Commission gives more weight to the testimony of Dr. Klimas because plaintiff experienced symptoms away from the work environment and without exposure to powdered gloves, and hereby finds as fact that plaintiff's exposure to powdered latex gloves in her employment did not cause any aggravation or worsening of her conditions and did not cause any disability or impairment of any kind.
53. Plaintiff's employment with defendant, and specifically her exposure to powdered latex gloves in that employment, did not cause, significantly contribute to, or materially aggravate her vasomotor rhinitis, conjunctivitis, or asthma.
54. Plaintiff's employment with defendant, and specifically her exposure to powdered latex gloves in that employment, did not place her at an increased risk of developing vasomotor rhinitis, conjunctivitis, or asthma, as compared to members of the general public not so employed. Plaintiff's vasomotor rhinitis, conjunctivitis, and mild intrinsic asthma are ordinary diseases of life that are not characteristic of, or peculiar to, plaintiff's employment with defendant.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff's subjective complaints and symptoms both at work and at home, including the alleged incidents she reported while employed with defendant, are due to her vasomotor rhinitis, conjunctivitis, and asthma. These conditions are ordinary diseases of life that are not characteristic of, or peculiar to, plaintiff's employment with defendant. Plaintiff's employment with defendant did not place her at an increased risk of developing these conditions as compared to members of the public not so employed. Moreover, these conditions were not caused, significantly contributed to, or materially aggravated by her employment with defendant. Therefore, plaintiff's vasomotor rhinitis, conjunctivitis, and asthma are not compensable occupational diseases within the meaning of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff failed to establish by the greater weight of the evidence that she has latex allergy or any compensable occupational disease within the meaning of N.C. Gen. Stat. §97-53(13).
3. Plaintiff, therefore, is not entitled to any compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim for workers' compensation benefits must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This 23rd day of June 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER